UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

John Anthony Castro

    v.                                                                                    Civil No. 23-cv-416-JL
                                                                                          Opinion No. 2023 DNH 137

New Hampshire Secretary of State,
David M. Scanlan, and Donald J. Trump

## MEMORANDUM ORDER

This case presents jurisdictional issues of standing and justiciability that the court must resolve before addressing the merits of the plaintiff's claim. Plaintiff John Anthony Castro seeks an injunction barring the New Hampshire Secretary of State from placing former President Donald J. Trump's name on the New Hampshire Republican Presidential primary ballot, on the ground that Trump is ineligible to serve as president under Section 3 of the Fourteenth Amendment of the U.S. Constitution.[1] Castro named the Secretary as a defendant and Trump as a nominal defendant.[2] The defendants argue that the case should be dismissed because Castro does not have standing to seek the requested relief, and his claim raises a nonjusticiable political question.

After reviewing the parties' filings and holding an evidentiary hearing and oral argument on October 20, 2023, the court finds that it lacks jurisdiction to consider Castro's request for injunctive relief. Castro has not established that he has or will suffer

---

[1] While Castro is appearing pro se in this litigation, he represents that he has two law degrees. He also represents that he is not a member of the bar in any state or jurisdiction.

[2] For ease of reference, the court refers to both Trump and the Secretary as defendants throughout this Order.

a political competitive injury arising from Trump's participation in the New Hampshire Republican Presidential primary. Thus, Castro has not carried his burden to show that he has standing to bring his claim. Further, even if Castro had standing, the court is inclined to find, consistent with the weight of authority, that Castro's claim raises a nonjusticiable political question. The court accordingly denies Castro's motion for a preliminary injunction and dismisses the case.

I. **Background**

Castro "asks this Court to issue an injunction preventing Defendant Secretary of State from accepting and/or processing Defendant Donald John Trump's ballot access documentation, including, but not limited to nominating papers and nominating petitions."[3] As grounds for relief, Castro alleges that Trump "provided 'aid or comfort' to an insurrection in violation of Section 3 of the [Fourteenth] Amendment to the U.S. Constitution and is, therefore, constitutionally ineligible to pursue or hold any public office in the United States."[4] Castro also alleges that Trump is a "nominal" defendant; he brings no claim requesting relief against Trump.[5]

---

[3] Compl. (doc. no. 1) at ¶ 16. Because Trump has now filed his declaration as a candidate in the New Hampshire primary and paid the filing fee, Castro's claim for injunctive relief may have become moot. Assuming, without deciding, that an injunction could stop the Secretary from "accepting and/or processing" Trump's "ballot access documentation," the court proceeds to address the other jurisdictional issues, which are determinative.

[4] Id. at 5 (emphasis in original).

[5] Id. at ¶ 5.

Shortly after filing a complaint in this court on September 5, 2023, Castro filed a motion for an expedited preliminary injunction, on September 17.[6] A few weeks later, the court granted the New Hampshire Republican State Committee's motion to intervene in the case. The court then held an evidentiary hearing and oral argument on October 20, to address jurisdictional issues prior to considering the merits of Castro's claim.[7] Castro, counsel for the defendants, and counsel for the intervenor attended and participated in the hearing. Castro, the Secretary, and Trump also filed witness lists, exhibit lists, and proposed findings of fact and rulings of law.

The following facts are agreed to or based on the evidence (testimony, exhibits, and stipulations) presented at the hearing, as noted. Castro has declared his candidacy for the New Hampshire Republican Presidential primary and paid the filing fee.[8] Castro has also declared his candidacy in the Nevada Republican Presidential primary.[9] Trump has now (five days after the hearing) also declared his candidacy in the New Hampshire Republican Presidential primary and paid the filing fee.

Castro and the defendants stipulated to the following description of Castro's campaign in New Hampshire:

> Presently, Plaintiff's campaign has no serious prospect of getting any New Hampshire delegates to the Republican National Convention, nor any

---

[6] See Motion for Preliminary Injunction (doc no. 6).

[7] Summary Order (doc. no. 20); Procedural Order (doc. no. 36).

[8] Pl. ex. 1.

[9] Pl. ex. 2.

significant number of votes that would otherwise have gone to Donald Trump, nor any appreciable share of donations that otherwise would have gone to Donald Trump; as of right now.[10]

Castro further acknowledges that he is, at best, a "longshot Republican Presidential candidate."[11]  Trump introduced evidence of Castro's filings with the Federal Election Commission, which show that Castro's campaign has no contributions and no expenditures.[12]  Further, Castro's campaign has not run or purchased any advertising in New Hampshire or any other state.[13]

During the hearing, Trump called Michael Dennehy to testify as an expert witness regarding Castro's campaign in New Hampshire and the effects, if any, of Trump's participation in the New Hampshire Presidential primary on Castro's prospects as a candidate.  Dennehy has worked as a political consultant and strategist for over three decades and has a consulting firm in New Hampshire, Dennehy & Bouley.[14]  He has served in a variety of positions in Republican politics, including as a committeeman on

---

[10] Stipulation (doc. no. 53) at ¶ 12.

[11] Id. at ¶ 4.

[12] Castro's FEC Filings (Trump Exs. 2, 4-6).  Castro testified that he would correct and update the FEC filings to show expenditures for his filing fees and other litigation expenses, including his expenses incurred in this case.

[13] See Oct. 20, 2023 Hearing Tr. (doc. no. 58) at 54:19-24 (Castro Testimony) ("Q. So your campaign hasn't run any advertisements in New Hampshire; is that right? A. Not as of now, correct. Q. Okay. And it hasn't run any advertisements in any other state, correct? A. Correct. Yes."); Stipulation (doc. no. 53) at ¶ 10 ("Plaintiff's campaign is not yet running any advertisements in New Hampshire.  Plaintiff's campaign strategy is to postpone advertising until the right moment.").

[14] See Oct. 20, 2023 Hearing Tr. (doc. no. 58) at 26:6-17 (Dennehy testimony).

4

the Republican National Committee, Executive Director of the New Hampshire Republican Party, and a political director and campaign manager in several Republican political campaigns.[15] The parties agreed to the admissibility of Dennehy's opinion testimony under Federal Rule of Evidence 702, and Castro cross-examined Dennehy.

Dennehy opined that Castro has no chance of winning a delegate in the New Hampshire Presidential primary election.[16] In explaining this opinion, Dennehy enumerated a number of observations regarding Castro's campaign. He testified that "polling data" on Castro was "nonexistent"[17]; to his knowledge, and consistent with Castro's admissions, Castro has no advertisements, campaign office, or employees in New Hampshire[18]; and Castro's campaign website is "amateur" and "incomplete."[19] Dennehy also testified that the presence or absence of Trump on the primary ballot in New Hampshire would not affect Castro's chances in that election "[b]ecause there is no activity to [Castro's] campaign."[20]

Castro testified at the hearing and was cross-examined by Trump's counsel as well. In response to questions from Trump's counsel, Castro could not identify any New

---

[15] See id. at 27:10-28:1 (Dennehy testimony).

[16] See id. at 33:12-19, 37:3-13 (Dennehy testimony).

[17] Id. at 31:13 (Dennehy testimony).

[18] See id. at 35:15-36:23 (Dennehy testimony).

[19] Id. at 34:5-6 (Dennehy testimony).

[20] Id. at 38:1-6 (Dennehy testimony).

Hampshire voter to whom he has spoken for purposes of his campaign (although he testified that he had "[d]iscussions with voters").[21]  He also confirmed that his FEC filings show that his campaign has no contributors, other than himself, and almost no money.[22]  Castro also agreed that a primary goal of his candidacy is to establish the impermissibility of Trump's presidency, and that he has filed 27 lawsuits seeking to keep Trump's name off of the ballot in various states.[23]

## II.     Applicable legal standard

"Federal courts, as courts of limited jurisdiction, may not presume the existence of subject matter jurisdiction, but rather, must appraise their own authority to hear and determine particular cases."  Watchtower Bible & Tract Soc. of N.Y., Inc. v. Colombani, 712 F.3d 6, 10 (1st Cir. 2013); accord United States v. Rivera-Rodríguez, 75 F.4th 1, 13 (1st Cir. 2023).  The party who asserts jurisdiction bears the burden of establishing that it exists by a preponderance of the evidence.  Woo v. Spackman, 988 F.3d 47, 53 (1st Cir. 2021); U.S. ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 54 (1st Cir. 2009).

---

[21] See id. at 58:11-21 (Castro testimony).

[22] See id. at 61:2-63:15 (Castro testimony).

[23] See id. at 68:24-69:6, 71:14-21 (Castro testimony); see also Stipulation (doc. no. 53) at ¶ 16 ("One of many goals of this campaign is for Plaintiff to demonstrate his legal ingenuity, ability to effectuate a national litigation strategy with minimal resources (i.e. guerrilla lawfare), and demonstrate executive leadership capabilities.").

**III.     Analysis**

The defendants challenge Castro's claim on two jurisdictional grounds—lack of standing and nonjusticiability under the political question doctrine. The court considers standing first and then turns to the issue of justiciability.

**A. Standing**

"Under Article III of the Constitution, a plaintiff needs a 'personal stake' in the case." Biden v. Nebraska, 143 S. Ct. 2355, 2365 (2023) (quoting TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203 (2021)). More specifically, "the plaintiff must have suffered an injury in fact—a concrete and imminent harm to a legally protected interest, like property or money—that is fairly traceable to the challenged conduct and that is likely to be redressed by the lawsuit." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Also, "[a]n inquiry into standing must be based on the facts as they existed when the action was commenced." Ramírez v. Sánchez Ramos, 438 F.3d 92, 97 (1st Cir. 2006). Nevertheless, "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." Webb v. Injured Workers Pharm., LLC, 72 F.4th 365, 372 (1st Cir. 2023) (quoting TransUnion, 141 S. Ct. at 2210). The injury, however, must be "concrete and particularized" and "not conjectural or hypothetical." Lujan, 504 U.S. at 560.

The plaintiff bears the burden of establishing standing. TransUnion, 141 S. Ct. at 2207. To carry that burden, the plaintiff must satisfy the three-part standing test against each defendant "with the manner and degree of evidence required at the successive stages

of the litigation." Webb, 72 F.4th at 371-72 (quoting TransUnion, 141 S. Ct. at 2208); see also Disability Rts. S.C. v. McMaster, 24 F.4th 893, 900 (4th Cir. 2022); Sierra Club, Inc. v. Granite Shore Power LLC, No. 19-CV-216-JL, 2019 WL 8407255, at *4 (D.N.H. Sept. 13, 2019). Here, where the court has held an evidentiary hearing on the jurisdictional issues including standing, Castro bears the burden to establish by a preponderance of the evidence that he has standing to litigate his claim. ForUsAll, Inc. v. U.S. Dep't of Labor, --- F. Supp. 3d ---, 2023 WL 5559682, at *3 (D.D.C. Aug. 2, 2023) (the plaintiff bears the burden of showing standing by a preponderance of the evidence (citing Lujan, 504 U.S. at 561)).

In attempting to satisfy his burden, Castro invokes the theory of competitor standing. This theory arose in the context of the commercial marketplace, specifically when government-imposed restrictions put certain market participants at a competitive disadvantage.[24] Katin v. Nat'l Real Est. Info. Servs., Inc., No. 07-10882-DPW, 2009 WL 929554, at *4 (D. Mass. Mar. 31, 2009). "In discrete contexts, courts have extended competitor standing to the political marketplace." AB PAC v. Fed. Election Comm'n, No. 22-2139(TJK), 2023 WL 4560803, at *4 (D.D.C. July 17, 2023) (citing Shays v.

---

[24] During the hearing, Castro relied heavily on the decision in New World Radio, Inc. v. F.C.C. to support his theory of competitor standing. 294 F.3d 164 (D.C. Cir. 2002). In that case, the plaintiff challenged the Federal Communications Commission's decision to allow another company to renew its license for a radio station. The plaintiff asserted that the FCC's action brought that company "one step closer to competing with, and therefore economically injuring," the plaintiff's Washington, D.C. radio station. Id. at 170. The New World court concluded that the plaintiff lacked competitor standing in part because the FCC's action was, "at most, the first step in the direction of future competition." Id. at 172 (competitor standing is "premised on the petitioner's status as a direct and current competitor whose bottom line may be adversely affected by the challenged government action") (emphasis in original). Neither the facts, the reasoning, nor the holding of New World support Castro's position.

8

FEC, 414 F.3d 76, 83-89, 92 (D.C. Cir. 2005) (candidates) and Natural Law Party of U.S. v. FEC,111 F. Supp. 2d 33, 45-46 (D.D.C. 2000) (political parties)); see also Schulz v. Williams, 44 F.3d 48, 53 (2d Cir. 1994) (political parties); Fulani v. Hogsett, 917 F.2d 1028, 1030 (7th Cir. 1990) (same); Nelson v. Warner, 472 F. Supp. 3d 297, 303-04 (S.D. W.Va. 2020) (finding competitor standing because a statute that prescribed the ballot order of candidates harmed plaintiff's electoral prospects).

In particular, courts have found a competitive injury in the political context where the plaintiff is subjected to "the burden of being forced to compete under the weight of a state-imposed disadvantage." Mecinas v. Hobbs, 30 F.4th 890, 899 (9th Cir. 2022). For example, in Shays v. FEC, the District of Columbia Circuit Court of Appeals concluded that "when regulations illegally structure a competitive environment—whether an agency proceeding, a market, or a reelection race—parties defending concrete interests (e.g., retention of elected office) in that environment suffer legal harm under Article III." 414 F.3d at 87; see also Mecinas, 30 F.4th at 898 (holding that that a ballot-order statute created an illegally structured competitive environment that supported standing).

Outside of state-imposed disadvantages in elections, "courts have [also] held that a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election." Hollander v. McCain, 566 F. Supp. 2d 63, 68 (D.N.H. 2008) (citing Tex. Dem. Party v. Benkiser, 459 F.3d 582, 586-87 & n.4 (5th Cir. 2006); Schulz, 44 F.3d at 53; and Fulani, 917 F.2d at 1030 and noting Gottlieb v. FEC, 143 F.3d 618, 622 (D.C.Cir.1998) (distinguishing voters who challenge candidate's

9

eligibility)).  Having traced the general contours of the relevant standing theories, the court now assesses Castro's evidence as to each of the three elements of standing, beginning with his purported injury, and then turning to traceability and redressability, which are analyzed together.

*Injury.*  To demonstrate an injury as a political competitor, a plaintiff must show that he has "a chance of prevailing in the election."  Grinols v. Electoral College, No. 12-cv-2997-MCE, 2013 WL 2294885, at *8 (E.D. Calif. May 23, 2013).  That is, the plaintiff must "truly [be] in competition" with the allegedly ineligible candidate.  Liberty Legal Found. v. Nat'l Dem. Party of the USA, Inc., 875 F. Supp. 2d 791, 800-01 (W.D. Tenn. 2012) (finding no political competitor standing for plaintiffs challenging President Obama's eligibility to run for president, where neither plaintiff "alleged that he is a Tennessee political party's nominee for the office, that his name will appear on the ballot for Tennessee's general election in November, that he is campaigning in the state of Tennessee, that any registered voter in Tennessee intends to cast a vote for him, or that President Obama's presence on the ballot will in any way injure either candidate's campaign.").

Castro makes no attempt to demonstrate that he is actually competing with Trump for votes and contributions, as required under the operative competitor standing theory. The evidence shows that Castro has not campaigned in New Hampshire or elsewhere. Castro has not provided any evidence suggesting that he has voters or contributors in New Hampshire or elsewhere, or that he will benefit from voter or contributor defections

from Trump to himself.[25] To the contrary, he acknowledges that he will not win any delegates in the primary. Consistent with this, Dennehy opined (without serious challenge) that Castro cannot win a single delegate in the New Hampshire primary, and he has no campaign activity.

The weaknesses in Castro's theory of competitive injury do not stop there. His claimed injury is also speculative, as it depends on what voters and contributors—independent, third parties—may do if Trump's name is not listed on the New Hampshire primary ballot. Castro provides no evidence that any Trump supporter would support Castro under that circumstance. By contrast, Trump provided Dennehy's opinion that no Trump supporters would switch allegiance to Castro if Trump does not appear on the ballot. An injury based on speculation about the decisions of independent actors does not confer standing. See Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331, 379 (W.D. Pa. 2020) (holding that it would not "endorse standing theories that rest on speculation about the decisions of independent actors" (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 414 (2013))).

---

[25] Castro's testimony at the hearing about his media coverage, which is not supported by any substantiating evidence, is not persuasive. The court has no way of knowing whether the purported media coverage focused on Castro as a candidate actually seeking the Republican nomination for president, or as a litigant seeking to disqualify Trump. The evidence in this case suggests the latter, and not the former, and does not support standing. Dennehy testified at length about the extent of media coverage that would be necessary to make Castro a viable candidate, and there is no dispute that Castro has not received that type of attention. Further, even if Castro were able to attract substantial media attention in the future, standing depends on the circumstances that existed when Castro filed his complaint and cannot be based on subsequent events.

Further, the evidence indicates that Castro is creating his own injury in order to manufacture standing to challenge Trump's eligibility to run for president. Indeed, by his own admission, Castro declared as a candidate and paid the filing fee to show the impermissibility of Trump's presidency. He asserts that one of his goals in the campaign is "to demonstrate his legal ingenuity, ability to effectuate a national litigation strategy with minimal resources (i.e. guerrilla lawfare), and demonstrate executive leadership capabilities."[26] This practice of manufacturing standing to pursue a cause through litigation is not supported by the law. See Equal Means Equal v. Ferriero, 3 F.4th 24, 30 (1st Cir. 2021); accord Elizabeth Cady Stanton Tr. v. Neronha, --- F. Supp. 3d ---, 2023 WL 6387874, at *5 (D.R.I. Sept. 8, 2023); see also Webb, 72 F.4th at 373 (holding that "plaintiff could not manufacture standing by incurring mitigation costs in the absence of an impending harm").

In sum, the evidence demonstrates that Castro is not competing and will not compete with Trump to win the New Hampshire primary, and for that reason, he is not a political competitor in the primary. Contrary to Castro's contention, he does not have a cognizable injury simply because his name is on the New Hampshire primary ballot, and he cannot manufacture standing by declaring his candidacy and paying the fee. For all of these reasons, Castro has not shown that he is suffering or would suffer an actual, competitive injury if Trump's name is listed on the New Hampshire Presidential primary ballot.

---

[26] Stipulation (doc. no. 53) at ¶ 16.

***Traceability and redressability.*** The traceability element of standing, "essentially a causation element of Article III standing, requires the plaintiff to show a sufficiently direct causal connection between the challenged action and the identified harm." Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc., 958 F.3d 38, 47 (1st Cir. 2020) (cleaned up). While some indirect causation may be sufficient, "[t]he Supreme Court has cautioned against courts finding that a plaintiff's injury is fairly traceable to a defendant's conduct where the plaintiff alleges a causal chain dependent on actions of third parties." Id. at 48. The redressability element, in turn, requires proof that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (1992); accord Dep't of Educ. v. Brown, 600 U.S. 551, 561 (2023). In many cases, traceability and redressability are addressed together as "two sides of a causation coin." Brookline Opportunities, LLC v. Town of Brookline, --- F. Supp. 3d ---, 2023 WL 4405659 at *5 n.8 (D.N.H. July 7, 2023) (quoting Dynalantic Corp. v. Dep't of Def., 115 F.3d 1012, 1017 (D.C. Cir. 1997)).

Because Castro has not shown a concrete and particularized injury, which is essential to carry his burden of establishing standing, the court need not address the traceability and redressability elements. Nevertheless, the court takes this opportunity to note that, even if Castro could establish an injury, he cannot meet the traceability and redressability requirements for standing.

Castro is seeking injunctive relief barring the Secretary from placing Trump's name on the New Hampshire Presidential primary ballot. This remedy would not redress Castro's purported injury because Dennehy testified, and Castro acknowledges, that

13

Trump's absence from the primary ballot would not affect the number of votes or contributions Castro would receive. Further, even if the Secretary refused to accept Trump's declaration of candidacy, as Castro requests, Trump could appear on completed ballots as a write-in candidate and still compete for and receive votes. Finally, the Secretary is not causing Trump's campaign to be active in New Hampshire and cannot stop its activities here. In other words, Trump's campaign activities and presence on the ballot are traceable to Trump, but not to the Secretary.

Finally, Castro seeks no relief from Trump in the complaint, and he seeks no restraint against Trump in his motion for injunctive relief. He simply names Trump as a "nominal" defendant. In the absence of any relief to redress his alleged injury, Castro lacks standing to maintain this lawsuit, even if he can show a competitive injury. Castro's motion for injunctive relief is thus denied, and his complaint dismissed, for lack of standing.

**B.  Political question doctrine**

The defendants also argue that Castro's claim should be dismissed because it turns on a nonjusticiable political question—Mr. Trump's eligibility to run for and serve as president. The political question doctrine bars courts from adjudicating issues that are "entrusted to one of the political branches or involve[ ] no judicially enforceable rights." Vieth v. Jubelirer, 541 U.S. 267, 277 (2004) (internal citations omitted). The nonjusticiability of political questions is "essentially a function of the separation of powers" of the federal government. Baker v. Carr, 369 U.S. 186, 217 (1962).

In Baker v. Carr, the Supreme Court described six circumstances that can give rise to a political question:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Id. The Baker Court held that, "[u]nless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." Id.

The defendants contend that Castro's claim triggers the first Baker formulation, and they cite a number of cases that support their position. Indeed, state and federal district courts have consistently found that the U.S. Constitution assigns to Congress and the electors, and not the courts, the role of determining if a presidential candidate or president is qualified and fit for office—at least in the first instance. Courts that have considered the issue have found this textual assignment in varying combinations of the Twelfth Amendment and the Electoral Count Act, 3 U.S.C. § 15, which prescribe the process for transmitting, objecting to, and counting electoral votes; the Twentieth Amendment, which authorizes Congress to fashion a response if the president elect and vice president elect are unqualified; and the Twenty-Fifth amendment and Article I impeachment clauses, which involve Congress in the removal of an unfit president from office.

15

For example, in Robinson v. Bowen, the plaintiff moved for a preliminary injunction removing Senator McCain from the 2008 California general election ballot on the ground that he was not a "natural-born citizen," as required under Article II of the U.S. Constitution. 567 F. Supp. 2d 1144, 1145 (N.D. Cal. 2008). The Robinson Court denied the motion and dismissed the case upon finding, in part, that the plaintiff's challenge raised a nonjusticiable political question. The Robinson Court noted that the Twelfth Amendment and the Electoral Count Act provide that "Congress shall be in session on the appropriate day to count the electoral votes," and that Congress decides upon the outcome of any objections to the electoral votes.[27] Id. at 1147. The Robinson Court reasoned that

---

[27] Castro contends that the Robinson Court's reasoning is no longer valid insofar as it relied on the Electoral Count Act's objection process to support its conclusion. He claims, without elaboration, that the Act was revised in 2022 "to limit objections only on the basis that either electors were not lawfully certified or that the vote count was irregular[.]" Castro's Supp. Resp. to Defs.' Mot. to Dismiss (doc. no. 44) at 3. Castro is correct that the Electoral Count Act was revised in 2022, after the Robinson order was issued, but, to the extent that he is arguing that this amendment limited the grounds for objections, that does not appear to be the case.

Both versions of the statute use the same terms to describe two exclusive grounds for objections to electoral votes. The amended version of the Act states that "[t]he only grounds for objections shall be as follows: (I) [t]he electors of the State were not lawfully certified under a certificate of ascertainment of appointment of electors according to section 5(a)(1) [and] (II) [t]he vote of one or more electors has not been regularly given." 3 U.S.C. § 15(d)(2)(B)(ii). The Act further provides that objections may only be "sustained by separate concurring votes of each House." Id. § 15(d)(2)(C). Prior to the amendment, the Act provided that all objections must be submitted for consideration to the Senate and House of Representatives, and "no electoral vote or votes from any State which shall have been regularly given by electors whose appointment has been lawfully certified to . . . shall be rejected, but the two Houses concurrently may reject the vote or votes when they agree that such vote or votes have not been so regularly given by electors whose appointment has been so certified." 62 Stat. 675 (1948) (current version at 3 U.S.C. § 15). Castro does not argue, nor does it appear to the court, that the relevant terms— "lawfully certified" and "regularly given"—took on new meaning through the amendment process, thereby materially altering the grounds for objections to electoral votes.

16

> it is clear that mechanisms exist under the Twelfth Amendment and [the Electoral Count Act] for any challenge to any candidate to be ventilated when electoral votes are counted, and that the Twentieth Amendment provides guidance regarding how to proceed if a president elect shall have failed to qualify. Issues regarding qualifications for president are quintessentially suited to the foregoing process. . . . Therefore, this order holds that the challenge presented by plaintiff is committed under the Constitution to the electors and the legislative branch, at least in the first instance. Judicial review—if any—should occur only after the electoral and Congressional processes have run their course.

Id. (citing Texas v. United States, 523 U.S. 296, 300-02 (1998)).

Similarly, in Grinols v. Electoral Coll., the plaintiffs moved for a temporary restraining order halting the re-election of then-President Obama on the ground that he was ineligible for office because he was not a natural-born citizen. 2013 WL 211135, at *1. The Grinols Court denied the motion largely because it found the plaintiffs' claim "legally untenable." Id. at *2. It reasoned, in part, that "numerous articles and amendments of the Constitution," including the Twelfth Amendment, Twentieth Amendment, Twenty-Fifth Amendment, and the Article I impeachment clauses, "make it clear that the Constitution assigns to Congress, and not the Courts, the responsibility of determining whether a person is qualified to serve as President. As such, the question presented by Plaintiffs in this case—whether President Obama may legitimately run for office and serve as President—is a political question that the Court may not answer." Id. at *4.

Courts across the country have reached the same conclusion, based on similar reasoning. See, e.g., Kerchner v. Obama, 669 F. Supp. 2d 477, 483 n.5 (D.N.J. 2009) (referencing the Twelfth and Twentieth Amendments, as well as Congress's role in counting electoral votes, and concluding that "it appears that" the plaintiffs'

17

constitutional claims premised on President Obama's purported ineligibility are "barred under the 'political question doctrine' as a question demonstrably committed to a coordinate political department"), aff'd 612 F.3d 204 (3d Cir. 2010); Taitz v. Democrat Party of Mississippi, No. 3:12-CV-280-HTW-LRA, 2015 WL 11017373, at *16 (S.D. Miss. Mar. 31, 2015) ("find[ing] no authority in the Constitution which would permit [the court] to determine that a sitting president is unqualified for office or a president-elect is unqualified to take office[,]" and concluding that "[t]hese prerogatives are firmly committed to the legislative branch of our government"); Jordan v. Secretary of State Sam Reed, No. 12-2-01763-5, 2012 WL 4739216, at *1 (Wash. Super. Aug. 29, 2012) ("The primacy of congress to resolve issues of a candidate's qualifications to serve as president is established in the U.S. Constitution.").

    Critically, Castro does not present case law that contradicts the authority discussed above—nor has the court found any. To the contrary, Castro agrees that his claim may raise a political question that precludes jurisdiction, but he quibbles (without reason) about the timing of this jurisdictional effect. Castro asserts that the cases that the defendants cite were initiated or decided after the political parties held their national conventions to select presidential nominees. According to Castro, this circumstance alone "proves that the political question doctrine applies only after the major political parties hold their conventions and submit the nomination paperwork to the state for placement on the general election ballot."[28] Even if Castro's factual premise regarding

---

[28] Castro's Supp. Resp. to Defs.' Mot. to Dismiss (doc. no. 44) at 3-4 (emphasis in original).

the timing of the cases and decisions is accurate—a conclusion that the court does not and need not draw—Castro's argument is wholly underdeveloped and unsubstantiated. Castro does not point to any factual or legal authority to support the notion that the political question doctrine, and the separation-of-powers principle at its core, simply lay dormant until after the national conventions, and the court finds no reasoned basis for such a conclusion.

In sum, the vast weight of authority has held that the Constitution commits to Congress and the electors the responsibility of determining matters of presidential candidates' qualifications.[29] Castro provides no reason to deviate from this consistent authority. Thus, it appears to the court that Castro's claim—which challenges Trump's eligibility as a presidential candidate under Section 3 of the Fourteenth Amendment—raises a nonjusticiable political question. As such, even if Castro did have standing to assert his claim, the court would lack jurisdiction to hear it under the political question doctrine.

---

[29] It bears noting that courts dealing with this justiciability question have not undertaken a searching analysis of the text and history of, for example, the Electoral Count Act and the Twentieth Amendment, which potentially impact the proper application of the political question doctrine. As Castro has not referred to, much less argued for, the inapplicability of the doctrine on these grounds, this court deems these arguments waived, and declines to engage them. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## IV. Conclusion

For the reasons stated above, Castro's motion for a preliminary injunction[30] is DENIED, Trump's motion to dismiss[31] is GRANTED, and the case is dismissed.

    **SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

October 27, 2023

cc:    John Anthony Castro, pro se
       Brendan Avery O'Donnell, Esq.
       Richard J. Lehmann, Esq.
       David Warrington, Esq.
       Jonathan Mark Shaw, Esq.
       Mark Meuser, Esq.
       Bryan K. Gould, Esq.
       Morgan Tanafon, Esq.

---

[30] Doc. no. 6.

[31] Doc. no. 31.